# NO. 12-16-00184-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *GRACE CREEK DEVELOPMENT, LP AND THE CHALLENGE GOLF GROUP LIMITED, APPELLANTS* | § | *APPEAL FROM THE 7TH* |
| | § | *JUDICIAL DISTRICT COURT* |
| *V.* | | |
| *REM-K BUILDERS, LTD., APPELLEE* | § | *SMITH COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Grace Creek Development, LP and The Challenge Golf Group Limited filed a motion for rehearing of our April 28, 2017 opinion. We overrule the motion for rehearing, withdraw our opinion and judgment of April 28, 2017, and substitute the following opinion and corresponding judgment in their place.

Grace Creek Development, LP and The Challenge Golf Group Limited appeal from a summary judgment in favor of REM-K Builders, Ltd. in the latter's suit on a note. In six issues, Appellants contend there are fact issues on their affirmative defenses and counterclaims. We affirm in part and reverse and remand in part.

### BACKGROUND

Grace Creek Development, LP is a Texas limited partnership, and The Challenge Golf Group is its general partner. David Carlile is The Challenge Golf Group's president. Appellants agreed to purchase a real estate development known as Eagle's Bluff from Ralph E. Martin and several entities he owned, including REM-K. Eagle's Bluff includes a section of single family homes and a section of townhomes known as The Villas. The sales contract was signed on November 25, 2009 and amended in December and again in January 2010. The real estate lien

note in the amount of $400,000.00 was dated December 31, 2009. Appellants were to make quarterly interest only payments through December 31, 2011, at which time the entire unpaid balance was to be paid in full. Appellants made one $20,000.00 interest payment in November 2010. They made no additional payments on the note. REM-K filed its suit to collect the debt on April 25, 2014. In their answer, Appellants asked that the court render judgment that REM-K take nothing on its claims and, instead, award damages to Appellants due to alleged fraud in the inducement and Deceptive Trade Practices Act violations by REM-K. Appellants also asserted numerous affirmative defenses.

REM-K filed a combined traditional and no evidence motion for summary judgment supported by numerous exhibits. REM-K asked for "damages in the sum of $998,584.39 through April 30, 2016 with an additional $499.29 for each day thereafter until final judgment is rendered." Appellants responded, also presenting evidence, and requesting the court deny all relief requested by REM-K. The trial court granted REM-K's motion for summary judgment and ordered Appellants to pay $998,584.39, which reflects the note balance and interest as of April 30, 2016, plus daily interest after that at $499.29 per day, attorney's fees of $60,000.00 through trial, and additional amounts in attorney's fees in case of appeal.

## STANDARD OF REVIEW

We review the trial court's decision to grant summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n*, 253 S.W.3d 184, 192 (Tex. 2007). A party moving for traditional summary judgment bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). A plaintiff moving for summary judgment must conclusively establish all essential elements of its cause of action as a matter of law. *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986) (per curiam). Once the movant establishes its right to summary judgment as a matter of law, the burden shifts to the non-movant to present evidence raising a genuine issue of material fact. *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014). To determine if there is a fact issue, we review the evidence in the light most favorable to the non-movant, crediting evidence favorable to the non-movant if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). The evidence raises a genuine issue of fact if

2

reasonable and fair minded jurors could differ in their conclusions in light of all the summary judgment evidence. ***Goodyear Tire & Rubber Co. v. Mayes***, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam).

The party moving for summary judgment in opposition to a counterclaim is in the position of a defendant opposing a plaintiff's motion for summary judgment. ***Adams v. Tri-Continental Leasing Corp.***, 713 S.W.2d 152, 153 (Tex. App.−Dallas 1986, no writ). In order to defeat such a counterclaim by a summary judgment, the counter-defendant must show that no issue of material fact exists as to at least one element of the counter-plaintiff's cause of action, or establish each element of an affirmative defense, and that the counter-defendant is entitled to judgment as a matter of law. ***Ryland Group, Inc. v. Hood***, 924 S.W.2d 120, 121 (Tex. 1996) (per curiam); ***Adams***, 713 S.W.2d at 153.

## DAMAGES CALCULATION

In their first issue, Appellants assert that REM-K erroneously determined the amount due on the real estate lien note, which specifies an 18% rate per annum. Specifically, they contend that through its calculations, REM-K erroneously compounded interest at 18% per quarter, resulting in the usurious rate of 19.25%. They argue they are entitled to a proper calculation of the amount they owe on the note.

### The Note

Pursuant to the real estate lien note, Appellants were to pay interest only, in quarterly payments, for two years. The entire unpaid balance of both principal and accrued interest was to be paid in full on December 31, 2011. The note also provided that "[a]ll past due principal and interest shall bear interest from date of maturity until paid at the lesser of (a) eighteen percent (18%) per annum, or (b) at the highest interest rate allowed under applicable law."

In a case involving a note containing language very similar to this provision, the Austin Court of Appeals determined that, by use of this language, the parties expressly agreed to compound interest. ***Bair Chase Prop. Co., LLC v. S & K Dev. Co.***, 260 S.W.3d 133, 142 (Tex. App.−Austin 2008, pet. denied) (held that language in note stating that "past due principal and/or interest shall bear interest from and after maturity" constitutes an express agreement to compound interest). Likewise, the note at issue here calls for compound interest, "per annum." The parties agree that 18% is the highest interest rate allowed by law.

3

**Usury**

Appellants assert that the problem arose because REM-K, when it calculated amounts currently owed under the note, compounded interest on a quarterly basis, rather than annually, resulting in a usurious rate. However, Appellants admit that the contract does not call for payment of usurious interest.

"Usurious interest" means interest that exceeds the applicable maximum amount allowed by law. TEX. FIN. CODE ANN. § 301.002(a)(17) (West 2016). The purpose of the usury statute is to punish those who intentionally charge usurious interest. *C & K Invs. v. Fiesta Group, Inc.*, 248 S.W.3d 234, 241 (Tex. App.−Houston [1st Dist.] 2007, no pet.). Thus, a creditor who contracts for or receives interest that is greater than the amount authorized by statute in connection with a commercial transaction is subject to penalties. TEX. FIN. CODE ANN. § 305.001(a-1) (West 2016).

We conclude that Appellants' asserted complaint, although referred to as usury, is not usury and arose during litigation at the time REM-K calculated the amount urged as owed. Therefore, under these circumstances, REM-K is not subject to a penalty under the finance code. *See George A. Fuller Co. of Tex., Inc. v. Carpet Servs., Inc.*, 823 S.W.2d 603, 606 (Tex. 1992) (Mauzy, J., concurring) (explaining that the usury statute does not apply to claims made solely in the context of judicial proceedings).

**Erroneous Damages Calculation**

The crux of Appellants' complaint is that REM-K erroneously calculated the amount of damages it is entitled to under the terms of the note. As movant, REM-K was required to establish the amount due on the note. *See* TEX. R. CIV. P. 166a(c); *Bailey, Vaught, Robertson & Co. v. Remington Invs., Inc.*, 888 S.W.2d 860, 866 (Tex. App.−Dallas 1994, no writ).

In its motion for summary judgment, REM-K asserted that Appellants owe principal and interest in the amount of $998,584.39 as of April 30, 2016, and an additional $499.29 for each day thereafter until final judgment is rendered. REM-K relied on the unsworn declaration of Ty Beard, the trustee of a trust that owns REM-K.[1] Beard specified the exact amount owed, but provided no explanation or calculation showing how he reached that amount. In REM-K's

---

[1] Beard's declaration was filed pursuant to Texas Civil Practice and Remedies Code Section 132.001 which allows testimony in compliance with that section to be used in place of an affidavit to support a summary judgment motion. TEX. CIV. PRAC. & REM. CODE ANN. § 132.001 (West Supp. 2016).

response to interrogatories, it asserted the specific amount that Appellants allegedly owed on each January first from 2011 through 2016, as follows:

1/1/11 $402,129.00
1/1/12 $465,524.00
1/1/13 $555,146.00
1/1/14 $662,022.00
1/1/15 $789,473.00
1/1/16 $941,461.00

Typically, a balance on a promissory note is a liquidated damage because the difference between the amount of indebtedness alleged to be due and the face amount of the note does not create ambiguity or raise a question of fact regarding payment credits. *In re N. Nat. Gas Co.*, 327 S.W.3d 181, 187 (Tex. App.−San Antonio 2010, orig. proceeding). An affidavit setting forth the total balance due on a note is generally sufficient to sustain summary judgment, and detailed proof of the balance is not required. *FFP Mktg. Co. v. Long Lane Master Trust IV*, 169 S.W.3d 402, 411 (Tex. App.−Fort Worth 2005, no pet.). Thus, in some cases, damages can be calculated as a matter of law based on the face amounts of the note and the pleadings. *Id*.

Here, however, REM-K presented conflicting evidence in support of its claim for damages. The note required Appellants to pay 5% interest, quarterly from December 31, 2009 through December 31, 2011. Summary judgment evidence shows that Appellants made a single interest payment of $20,000.00 in November 2010 and never paid any principal. Principal of $400,000.00 and accrued interest was to be repaid on December 31, 2011. Therefore, Appellants owed $420,000.00 on December 31, 2011. The note clearly required interest on past due principal and interest, that is, after December 31, 2011, at the rate of 18% per annum. Given an amount of principal, interest rate, and method of calculating interest, the resulting interest calculation is reached arithmetically as a matter of law. *See McLemore v. Pac. Sw. Bank, FSB*, 872 S.W.2d 286, 290-91 (Tex. App.−Texarkana 1994, writ dism'd by agr.). Application of the appropriate mathematical calculation shows that, one year later, Appellants would owe $495,600.00. The record does not show how REM-K arrived at $555,146.00. All amounts claimed thereafter are similarly insupportable. REM-K's unsworn declaration and response to interrogatories conflicted with the terms of the note. REM-K's conflicting evidence raises a fact issue as to how much Appellants owe REM-K. *See Guerra v. M.H. Equities, Ltd.*, No. 02-11-00261-CV, 2012 WL 2135596, at *2 (Tex. App.−Fort Worth June 14, 2012, no pet.) (mem. op.). Because REM-K did not show that it calculated damages in compliance with the note, it did not

show as a matter of law the amount due on the note. *See **Bailey, Vaught, Robertson & Co.***, 888 S.W.2d at 866-67. Therefore, REM-K did not prove its entitlement to summary judgment for the amount due under the note. *See **Guerra***, 2012 WL 2135596, at \*2; ***Bailey, Vaught, Robertson & Co.***, 888 S.W.2d at 867. We sustain Appellants' first issue.


## UNENFORCEABLE PENALTY

In their second issue, Appellants assert that there is a fact or legal issue on whether the increase in the interest rate of the note from 5% to 18% in the event of a default is an unenforceable penalty clause. Based on the absence of evidence that the increase reflects an estimate of REM-K's damages resulting from Appellants' default, Appellants contend that the increase is an unenforceable penalty clause designed to secure performance by punishing Appellants for missing a payment and defaulting on the note.

Courts will not enforce punitive contractual damages provisions. ***FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.***, 426 S.W.3d 59, 69 (Tex. 2014). Liquidated damages clauses, however, are permitted and fix in advance the compensation to a party accruing from the failure to perform specified contractual obligations. ***Valence Operating Co. v. Dorsett***, 164 S.W.3d 656, 664 (Tex. 2005). Contractual damages provisions will be enforced if the court finds that the harm caused by the breach is impossible or difficult to estimate and the amount of liquidated damages called for is a reasonable forecast of just compensation. ***FLP Energy, LLC***, 426 S.W.3d at 69. A liquidated damages provision is unenforceable if it is actually a penalty for noncompliance rather than just compensation for loss, which is a question of law for the court to decide. *Id*. at 70. However, to show that a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for, the party asserting the penalty defense bears the burden of proving what the actual damages were. ***Phillips v. Phillips***, 820 S.W.2d 785, 788 (Tex. 1991).

The amount of damages due REM-K could be determined by a calculation using the figures and interest rate set forth in the note. *See **Shin-Con Devel. Corp. v. I.P. Invs., Ltd.***, 270 S.W.3d 759, 767 (Tex. App.−Dallas 2008, pet. denied). Appellants failed to present evidence that REM-K's actual damages were other than that calculated by the information on the face of the note. Thus, there is no fact question on whether the liquidated damages clause is an unenforceable penalty. We overrule Appellants' second issue.

In their third issue, Appellants assert that the provision in the note increasing the interest rate from 5% to 18% is a modification of the sales contract for which they received no consideration. They contend there is a fact question regarding whether this modification was unenforceable. Further, Appellants assert the judgment improperly denied this defense because it was not addressed in the motion for summary judgment.

Appellants included this claim in their amended pleading, which was filed after REM-K filed its motion for summary judgment. Appellants had the burden to raise a fact question on each element of their affirmative defense. *Seale v. Nichols*, 505 S.W.2d 251, 254 (Tex. 1974). Therefore, the fact that REM-K did not address this defense is inapposite. *See Nicholson v. Mem. Hosp. Sys.*, 722 S.W.2d 746, 749 (Tex. App.−Houston [14th Dist.] 1986, writ ref'd n.r.e.) (Appellant who raised affirmative defense in response to motion for summary judgment, but did not establish a material issue of fact on the elements of his affirmative defense, did not prevent summary judgment for movant).

Parties having the power to make a contract may modify their contract in any manner they choose. *Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 228 (Tex. 1986). The modification must be supported by new consideration. *Rhoads Drilling Co. v. Allred*, 70 S.W.2d 576, 583 (Tex. 1934). Consideration is either a benefit that accrues to one party or a detriment incurred by the other party. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991). Separate documents executed at or near the same time, for the same purpose, and in the course of the same transaction are to be construed together in order to ascertain the entire agreement between contracting parties. *Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324, 327 (Tex. 1984).

The sales contract specifies that the contract and any closing documents constitute the entire agreement of the parties concerning the sale of the property. It signaled the weight of the note by providing that if there is a conflict between the sales contract and the closing documents, the closing documents will control. Because the sales contract did not specify the rate of interest to be applied to past due principal and interest, there is no conflict between the two documents. Rather, a new term was added in the note. The original contract called for Appellants to pay $600,000.00 while the second amendment to the sales contract reduced that amount to $400,000.00. The note reflects the parties' new agreement as to the sales price. Pursuant to the

7

terms of the note, "for value received," Appellants promised to pay REM-K $400,000.00. The reduction constitutes a benefit to Appellants and a detriment to REM-K. Because the note is supported by consideration, Appellants did not raise a fact issue on whether the addition of the provision calling for 18% interest on past due amounts is supported by consideration. *See Seale*, 505 S.W.2d at 254. We overrule Appellants' third issue.

## FAILURE TO MITIGATE

In their fourth issue, Appellants contend there is evidence showing that REM-K failed to mitigate its damages. They argue that, in spite of the fact that they made no payments on the note since November 2010, REM-K allowed the debt to grow before suing in 2014 and eventually, in 2016, seeking foreclosure.

The doctrine of mitigation of damages prevents a party from recovering for damages that could be avoided by reasonable efforts on the part of the plaintiff. *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995). Mitigation of damages is an affirmative defense and the burden of pleading and proving facts showing it is on the non-movant. *See Lunsford Consulting Grp., Inc. v. Crescent Real Estate Funding VIII, L.P.*, 77 S.W.3d 473, 476-77 (Tex. App.−Houston [1st Dist.] 2002, no pet.). The party raising the failure to mitigate defense must prove lack of diligence and the amount by which the failure to mitigate increased damages. *Kartsotis v. Bloch*, 503 S.W.3d 506, 522 (Tex. App.−Dallas 2016, pet. denied).

In their response to the motion for summary judgment, Appellants asserted that REM-K failed to mitigate its damages because it did not foreclose on the subdivision and file a suit for any deficiency. Creditors are not required to foreclose on collateral before suing on the note. *Carter v. Gray*, 81 S.W.2d 647, 648 (Tex. 1935); *Stephens v. LPP Mortg., Ltd.*, 316 S.W.3d 742, 746-47 (Tex. App.−Austin 2010, pet. denied). In their brief, Appellants complain that REM-K did not respond to their January 2012 offer to return the subdivision in exchange for cancellation of the note. REM-K's duty to mitigate damages does not require it to accept an offer conditioned on surrender of its claim on the note. *See Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 858 (Tex. 1999). Further, Appellants have not referred us to any evidence of the amount by which the asserted failure to mitigate increased damages. Our review of the record revealed none. We overrule Appellants' fourth issue.

8

In their fifth issue, Appellants contend there is evidence showing that REM-K fraudulently induced them to enter into the contract, and the note, for the purchase of the subdivision. Appellants assert that REM-K told them that the sewer system would allow for the sale of lots and failed to disclose known problems with the sewer system and sewer pump station. They argue that there is a fact issue as to whether these problems were discoverable by Appellants through the exercise of ordinary care. Appellants assert that these omissions support both their counterclaim and affirmative defense of fraudulent inducement.

In their sixth issue, Appellants contend that limitations does not bar their defenses and counterclaims that act to offset or cancel REM-K's claims. They argue that if a claim is of an intrinsically defensive nature the statute of limitations does not apply. They further assert that "neither [REM-K] in its MSJ nor the trial court in its Judgment cite to any evidence to show that Appellants were aware of the problem with the sewer system or the sewer pump station in the Subdivision more than four years before they filed their counterclaim on August 22, 2014."

## Appellants' Pleadings

Fraud may be an affirmative defense or an affirmative cause of action. *Adams*, 713 S.W.2d at 153. An affirmative defense is an independent reason that a plaintiff should not recover. *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 212 (Tex. 1996). A counterclaim denotes a defendant's claim for relief that will defeat or reduce a judgment the plaintiff is otherwise entitled to recover. *Doyer v. Pitney Bowes, Inc.*, 80 S.W.3d 215, 218 (Tex. App.−Austin 2002, pet. denied). To determine whether the claim is a counterclaim or an affirmative defense, we look to the pleadings to determine if the defendant asked for affirmative relief as part of the claim. *First Bank of Deer Park v. Harris Cty.*, 804 S.W.2d 588, 593 (Tex. App.−Houston [1st Dist.] 1991, no writ) (op. on reh'g). If the defendant asked for affirmative relief, the claim is a counterclaim. *Kuehnhoefer v. Welch*, 893 S.W.2d 689, 692 (Tex. App.−Texarkana 1995, writ denied). To qualify as a claim for affirmative relief, a defensive pleading must allege the defendant has a cause of action, independent of the plaintiff's claim, on which he could recover relief. *BHP Petroleum Co. v. Millard*, 800 S.W.2d 838, 841 (Tex. 1990).

In their eighth amended answer, Appellants requested that REM-K take nothing on its claims. They also asked for actual damages and/or rescission of their obligations under the note

due to fraud and punitive damages due to fraud.  Additionally, they argue that their counterclaim is of an intrinsically defensive nature and therefore the statute of limitations does not apply.  Specifically, Appellants argue that their "request for rescission is a defense to [REM-K's] cause of action for default."  We disagree.  Rescission is an equitable remedy that seeks to set aside an otherwise legal contract due to fraud, mistake, or for some other reason when it is necessary to avoid unjust enrichment of the non complaining party to the contract, so that the parties thereto may be restored, insofar as is possible, to the status or position they were in prior to execution of the contract.  *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 732 (Tex. App.−Fort Worth 2008, pet. denied).  A request for rescission does not make their pleading an affirmative defense.  *See Precision Sheet Metal Mfg. Co. v. Yates*, 794 S.W.2d 545, 550 (Tex. App.−Dallas 1990, writ denied) (held that rescission predicated on fraud is subject to the four year statute of limitations period).  Because Appellants asked for affirmative relief, the claim for fraudulent inducement is a counterclaim, not an affirmative defense.  *See Kuenhoefer*, 893 S.W.2d at 692.

**Limitations**

In its motion for summary judgment, REM-K asserted that Appellants' counterclaim for fraud in the inducement, which was filed August 22, 2014, is barred by limitations, including the statutory savings clause for counterclaims because, according to REM-K, the cause of action accrued in January 2010.  REM-K argued that Appellants had the opportunity to investigate all aspects of the property before closing.  The sales contract was effective on November 25, 2009, the first amendment to the sales contract was executed on December 31, 2009, the note is dated December 31, 2009, and the second amendment to the sales contract was executed January 14, 2010 and effective December 31, 2009.  Thus, if Appellants were injured, REM-K asserted, it was by January 2010.

Appellants argued in their response to the motion for summary judgment that, although more than four years had elapsed since they purchased Eagle's Bluff, they pleaded the discovery rule, claiming accrual of their cause of action was deferred.  REM-K responded that Appellants knew the facts on which their counterclaim is based in January 2010 and there is no evidence that the counterclaim was "inherently undiscoverable."

*Applicable Law*

A summary judgment movant on limitations bears the burden to (1) conclusively prove when the cause of action accrued, and (2) show either that the discovery rule does not apply or prove as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered the nature of its injury. ***KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.***, 988 S.W.2d 746, 748 (Tex. 1999); ***Pirtle v. Kahn***, 177 S.W.3d 567, 572 (Tex. App.−Houston [1st Dist.] 2005, pet. denied). If the movant does this, the non-movant must adduce evidence raising a fact issue in avoidance of limitations. ***KPMG Peat Marwick***, 988 S.W.2d at 748.

The statute of limitations for fraud is four years. TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(4) (West 2002); ***Williams v. Khalaf***, 802 S.W.2d 651, 658 (Tex. 1990). For the purposes of application of the statute of limitations, a cause of action generally accrues when the wrongful act occurs causing some legal injury to the claimant, even if the fact of injury is not discovered until later. ***Murphy v. Campbell***, 964 S.W.2d 265, 270 (Tex. 1997).

The discovery rule exception to limitations defers accrual of a cause of action until the time the injured party knows, or through the use of reasonable care and diligence should know the facts giving rise to the claim. ***Wagner & Brown, Ltd. v. Horwood***, 58 S.W.3d 732, 734 (Tex. 2001). The discovery rule applies only when the nature of the plaintiff's injury is both inherently undiscoverable and objectively verifiable. ***Id***. An injury is inherently undiscoverable if, by its nature, it is unlikely to be discovered within the prescribed limitations period despite due diligence. ***Id***. Discovery of a particular injury is dependent not solely on the nature of the injury but on the circumstances in which it occurred and plaintiff's diligence as well. ***S.V. v. R.V.***, 933 S.W.2d 1, 7 (Tex. 1996). A plaintiff who invokes the discovery rule must have sought information about its injuries and their likely cause once apprised of facts that would prompt a reasonably diligent person to make an inquiry that would lead to discovery of the cause of action. ***Seureau v. ExxonMobil Corp.***, 274 S.W.3d 206, 228 (Tex. App.−Houston [14th Dist.] 2008, no pet). Due diligence requires each contracting party to protect its own interests. ***Via Net v. TIG, Ins. Co.***, 211 S.W.3d 310, 314 (Tex. 2006).

When a plaintiff discovers or should have discovered the cause of its injury and whether a plaintiff exercised due diligence in so discovering the cause are questions of fact. ***Pirtle***, 177 S.W.3d at 572. However, if reasonable minds could not differ about the conclusions to be drawn

from the facts, the court may determine the commencement of the limitations period as a matter of law. *Id*. The discovery rule is negated when the evidence shows that no fact issue exists as to when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the nature of its injury. *Seureau*, 274 S.W.3d at 228.

Section 16.069 of the Texas Civil Practice and Remedies Code is a savings clause that applies if the statute of limitations has run on a counterclaim by the time the plaintiff files its petition. *See Ellard v. Ellard*, 441 S.W.3d 780, 782 (Tex. App.−San Antonio 2014, no pet.). A party to an action may file a counterclaim arising out of the same transaction that is the basis of the plaintiff's action, even though as a separate action it would be barred by limitation, if the counterclaim is filed within thirty days after the date on which the party's answer is required. TEX. CIV. PRAC. & REM. CODE ANN. § 16.069 (West 2015).

*Evidence*

Kathryn Martin Mitchell was married to Ralph Martin at the time Appellants purchased Eagle's Bluff. She attended some meetings between the parties but did not remember the sewer system or wastewater treatment facilities being discussed. She testified that she has no knowledge of any problems with the sewer pump station.

Richard Larkin stated in his affidavit that he purchased a home in The Villas in 2007. At some unspecified time later, a sewer pump station was built on his lot. As additional homes were built, the pump station became a problem due to its unpleasant sight, noise, and odor. He stated that, in 2012, the station "blew up and had a major spill." He felt that the wastewater collection system could not provide adequate service.

Gary Douglas, the east Texas Field Supervisor for Aqua Texas, Inc. or its predecessor since 1999, testified that Aqua owns and runs the water and wastewater systems that service Eagle's Bluff. Ralph Martin built the wastewater treatment plant, but Aqua has always operated it. Martin sold the systems to Aqua in approximately 2006. Douglas stated that the plant has not been altered since. Nothing changed regarding Aqua's involvement when Appellants purchased Eagle's Bluff. Douglas testified that it has never been necessary to build additional wastewater treatment facilities to service the additional phases of Eagle's Bluff. If it became necessary, it would be Aqua's responsibility. He testified that Aqua added wastewater collection facilities in 2007 or 2008. Under the operating agreement, the developer has no financial responsibility for designing, constructing, or maintaining the wastewater treatment plant.

Douglas testified that, during 2009, no one from the Carlile group came to him to inquire about the wastewater treatment plant. After the sale, Douglas initiated contact with Carlile to discuss issues that needed to be taken care of. Douglas stated that they did not discuss the capacity of the wastewater treatment plant. He testified that the lift station is currently functioning properly. Douglas denied ever telling Carlile or anyone representing him that the sewer system in the subdivision was incomplete or would be inadequate for additional home construction, as alleged by Appellants. He clarified that it is incomplete because lines are not built on the remaining empty lots. He explained that, if phase one of the development sold out, Aqua would need to build more solid separation holding tanks to make the system function correctly. He denied telling anyone that the sewer system was incomplete or inadequate except for phase two, and everyone knew that part was incomplete. He denied telling anyone that no more townhome lots could be sold because the sewer system is not adequate. He also denied consulting with Appellants regarding his knowledge of the wastewater treatment plant at Eagle's Bluff or the sewer system and lift station at the townhouse addition.

On cross examination, Douglas explained that he told other Aqua employees that he had concerns about whether the capacity of the gravity system in Eagle's Bluff would be adequate once more houses were built. Douglas testified that Larkin had many complaints about the lift station, including the looks, the smell, and the noise. He explained that he was not certain that Aqua would be responsible to pay for addressing any problem with the sewer system, but he suspected it would. Douglas later stated that he probably expressed concerns to Carlile or someone in his organization about the trouble Larkin, the owner of the lot where the lift station was located, was having with the gravity flow system. He stated that he would prefer a pump system over a gravity system at The Villas.

Darla Blackmon worked as the special events director at Eagle's Bluff, first for Martin, then for The Challenge Golf Group after Appellants purchased the property. She also did marketing for The Challenge Golf Group and, in 2012, obtained her real estate license and began selling property. Later, her job title changed to General Manager of Eagle's Bluff Country Club. The Challenge Golf Group sold the golf club and course in 2014 but she remains employed by Carlile. She testified that there was a problem with the smell at The Villas and one of the homeowners complained. The problems were at the pump station. Once there was a problem with leakage. Another homeowner also complained about the smell. She testified that, when

13

one of Carlile's associates wanted to see the property in 2009, she showed him around. She said it was not "smelling that day we were walking." She testified that she knew nothing about any representation by Ralph Martin to Carlile. Blackmon testified that sometime at the end of 2013 or beginning of 2014, Douglas told her that he did not know if the system could handle many more houses. He indicated there would need to be some kind of change to the collection system before many more homes could be added. Blackmon then told Carlile what Douglas had told her.

Carlile testified that they did not "do a lot of detailed looking at the sewer system or the water system." He said "there weren't any reports of people having any problems particularly." He did not recall asking Douglas if there were any issues. He explained that he spoke to Ralph and Kathy Martin, their attorney, and two people who worked for the Martins, Blackmon and Leslie, last name unknown. He could not specify who told him, but he understood that the infrastructure was completely in place and the pump station was big enough to handle the second phase of home building. He said "they definitely represented that the system was adequate." Appellants did not speak to the engineering firm that designed the pump station. When Carlile inspected the property, he did not observe a smell. He first learned about the smell problem from Larkin shortly after buying the property. Larkin complained of smell and noise problems relating to the sewer system. He testified that Larkin told Appellants that the Martins knew what Douglas said about the system not being adequate and about Larkin's problems. Carlile stated that, in 2010, after they purchased the property, Douglas told him that the lift station was not adequate for the total number of new homes they planned to build. In contrast, he explained that prior to the purchase they had been told that the subdivision was "ready to go for the first 30 lots or so" and after that they would "have to finish out the street in individual, like, sewer hookups, but the overall capacity of the subdivision . . . was there." In 2010, he knew Aqua was responsible for running the system, but he thought building a new lift station was his responsibility. He testified that Aqua, not Grace Creek, owns the pump station.

Carlile testified in a second deposition. He said that by the time he signed a letter of intent to purchase the property he had been looking at the property for only about thirty days. After the letter of intent was signed, he visited the property to check things out less than five times. He did not talk to Douglas or tour the sewer treatment plant before signing the sales contract. Referencing a sewer treatment plant tour, he stated, "I'd hope [sic] to avoid that. But I

– it's – lack of a better way of saying it, I smelt it. I got within a hundred yards of it." He did not look at any state permits that Aqua may have had. He explained that the system was in place and functioning and it was state regulated so he did not pay a lot of attention to the water and sewer system. They checked to see if the liquor permit was in place. They looked at the condition of the golf course, the buildings, the equipment, the kitchen, the membership list, where the irrigation system was and was it functioning, and salability. No third party consultants inspected the property. Carlile testified that Appellants probably discovered the inadequacy of the sewer system in late 2010 or early 2011.

Appellants presented letters, dated July 10, 2007, from Aqua to Lake Palestine Associates, the Ralph Martin entity that owned Eagle's Bluff at the time, stating that their production and treatment facilities for the water system and the treatment facilities for the wastewater system in Eagle's Bluff have the capacity to serve the anticipated population of the subdivision. The evidence shows that, in 2008, Lake Palestine Associates conveyed all assets used in providing water or sewer services to Aqua. In November 2010, Lake Palestine Associates and Appellants entered into a settlement agreement regarding certain disputed issues, not including the current complaints about the sewer system. In March 2011, Appellants' attorney wrote to the Texas Commission on Environmental Quality requesting the Commission require Aqua to correct certain specified problems with the water and sewer services at Eagle's Bluff. Additionally, he reiterated Larkin's complaints about the pump station.

In a letter to counsel for REM-K, dated January 16, 2012, Appellants' counsel explained that payments under the note have been delayed due to "the situation with Aqua Texas." He referenced the irrigation system on the golf course and Larkin's complaints. He specifically referenced Larkin's allegation that the Martins knew or should have known the sewer station by his house would be inadequate and a nuisance. He referenced discussions with two engineers who "tentatively agree that the system is inadequate for further villa lots." Counsel presented three possible options to resolve these matters including renewing the note for twelve months and paying the accrued interest, paying the note off at a discounted amount and releasing the Martins from any further liability, and canceling the note and returning the villa lots to the Martins.

*Analysis*

We review the evidence to determine if REM-K first met its burden on limitations. *See KPMG Peat Marwick*, 988 S.W.2d at 748. The sales transaction occurred between November 25, 2009 and January 14, 2010, and Appellants' cause of action accrued upon the allegedly fraudulently induced conveyance of the property. *See Lyles v. Johnson*, 585 S.W.2d 778, 782-83 (Tex. App.–Houston [1st Dist.] 1979, writ ref'd n.r.e.); s*ee also Seureau*, 274 S.W.3d at 226 (held that cause of action for fraud accrued on the date defendant made allegedly false representations when he signed letter agreement). Accordingly, the allegedly wrongful act resulting in injury and authorizing Appellants to seek a judicial remedy for fraud in the inducement occurred by January 14, 2010. *Murphy*, 964 S.W.2d at 270.

Appellants' allegation of fraudulent inducement was based on the assertion that Ralph Martin failed to disclose problems with the sewer system. The evidence reflects that, prior to the purchase, Appellants had the opportunity to inspect the property, applicable agreements with Aqua, documents pertaining to a road that had collapsed, club financials, plats of the property, the sewer system plans, and the basics of how the sewer and water systems worked. The sales contract allowed for a period of investigation by Appellants and the opportunity to terminate the contract after such an investigation. Due diligence may include asking a contracting party for information needed to verify the other's contractual performance. *Via Net*, 211 S.W.3d at 314. Appellants could have had inspections by appropriate professionals and could have spoken to Douglas prior to closing the sale. *See Seureau*, 274 S.W.3d at 229. Accordingly, the nature of the alleged problems with the sewer system were not inherently undiscoverable. *See Wagner & Brown, Ltd.*, 58 S.W.3d at 736-37 (held alleged injury not inherently undiscoverable where party could seek information from several sources to evaluate the propriety of another party's actions). Therefore, REM-K showed that the discovery rule did not apply. *See id*. at 734. Furthermore, reasonable minds could not differ about the conclusion to be drawn from the facts that, as a matter of law, in the exercise of reasonable diligence, Appellants should have discovered any problems with the sewer system before committing to the purchase and certainly within the limitations period. *S.V.*, 933 S.W.2d at 7; *Pirtle*, 177 S.W.3d at 572. Thus, REM-K met its initial burden on limitations and we next consider whether Appellants produced evidence raising a fact question in avoidance of limitations. *See KPMG Peat Marwick*, 988 S.W.2d at 748.

16

Carlile testified that he learned about the smell problem shortly after the purchase and discovered the "inadequacy" of the sewer system in late 2010 or early 2011. Appellants' counsel's January 2012 correspondence shows that Appellants knew of the sewer system problems and the possibility that Martin knew of them at that time. Thus, soon after closing, Appellants became apprised of facts that would prompt a reasonably diligent person to make inquiries that would lead to discovery of the cause of action. *See Seureau*, 274 S.W.3d at 228. Further, Larkin was vocal about the problems he experienced and available to consult. Carlile's testimony indicates that he performed, at most, only a perfunctory investigation of the sewer system at Eagle's Bluff before purchasing the incomplete housing development. Additionally, we note that the conflicts in testimony about what Douglas said or did not say concern the merits of the fraud question, not its discoverability. But if Douglas made a statement in 2010 about the inadequacy of the system, as Carlile testified, such a statement would cause a diligent person to investigate further and indicates the problem was discoverable.

In light of the evidence, especially Carlile's admission that he discovered the inadequacy of the sewer system in late 2010 or early 2011, we conclude that Appellants did not meet their burden to present evidence raising a fact question as to whether their injury was inherently undiscoverable. Thus, the discovery rule exception to limitations does not apply to defer accrual of their claim of fraudulent inducement. *See Wagner & Brown, Ltd.*, 58 S.W.3d at 734. Accordingly, limitations ran in January 2014. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.051.

Therefore, Appellants could have saved their counterclaim if they had complied with Section 16.069. Appellants filed their original answer on June 23, 2014. They filed the amended answer containing their counterclaims on August 22, 2014. Because their counterclaim for fraudulent inducement was not filed within thirty days after the date of their answer, it is barred by limitations. *See id*. § 16.069. We overrule Appellants' issues five and six.

### REM-K'S ATTORNEY'S FEES

REM-K asserted a cross-point arguing that the trial court erred by overruling its motion to modify the court's judgment. REM-K argued entitlement to additional attorney's fees incurred by it between the date it filed its motion for summary judgment and the date the trial court signed the summary judgment. REM-K cited to no authority in support of its issue and has therefore waived the complaint. *See* TEX. R. APP. P. 38.1(i); *Hernandez v. Hernandez*, 318

S.W.3d 464, 466 (Tex. App.−El Paso 2010, no pet.). Further, REM-K did not file a notice of appeal. Therefore, we may not grant it more favorable relief than the trial court did. *See* TEX. R. APP. P. 25.1(c); ***Lubbock Cty., Tex. v. Trammel's Lubbock Bail Bonds***, 80 S.W.3d 580, 584 (Tex. 2002). We overrule REM-K's cross-point.

## DISPOSITION

Because REM-K failed to establish the amount due on the note as a matter of law, we ***reverse*** that portion of the trial court's judgment awarding REM-K $998,584.39 in damages for its suit on the note, as well as the associated award of $499.29 in daily interest, and ***remand*** this cause to the trial court for further proceedings consistent with this opinion.

We ***affirm*** the summary judgment in all other respects.

GREG NEELEY
Justice

Opinion delivered May 31, 2017.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

18



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

MAY 31, 2017

NO. 12-16-00184-CV

**GRACE CREEK DEVELOPMENT, LP AND
THE CHALLENGE GOLF GROUP LIMITED,**
Appellants
V.
**REM-K BUILDERS, LTD.,**
Appellee

Appeal from the 7th District Court
of Smith County, Texas (Tr.Ct.No. 14-1110-A)

THIS CAUSE came to be heard on the oral arguments, appellate record, and briefs filed herein, and the same being considered, it is the opinion of this court that there was error in the judgment of the court below. In accordance with this court's opinion of this date, the judgment of the trial court is **affirmed** in part and **reversed** and **remanded** in part, as follows:

It is therefore ORDERED, ADJUDGED and DECREED that the portion of the trial court's judgment awarding damages of $998,584.39 and daily interest after April 30, 2016 of $499.29 is **reversed** and the cause is **remanded** to the trial court for further proceedings in accordance with this court's opinion.

It is further ORDERED, ADJUDGED and DECREED that the judgment of the court below is **affirmed** in all other respects.

It is further ORDERED that all costs of this appeal are hereby adjudged against Appellants, **GRACE CREEK DEVELOPMENT, LP AND THE CHALLENGE GOLF GROUP LIMITED**; and that the decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*